(633 P.2d 1154)

No. 51,982

WICHITA PROPERTIES, *Plaintiff-Appellant,* v. H. KENT LANTERMAN and CENTRAL BANK AND TRUST, *Defendants-Appellees,* and

H. KENT LANTERMAN, *Third Party Plaintiff-Appellee,* v. STANDARD LIQUOR CORPORATION, *Third Party Defendant-Appellee.*

Opinion filed August 21, 1981.

*Alexander B. Mitchell,* of Sargent, Klenda, Haag & Mitchell, of Wichita, for appellant.

*Michael B. Roach,* of Wichita, for appellee H. Kent Lanterman.

Before SPENCER, P.J., REES and MEYER, JJ.

MEYER, J.: This case involves the breach of a commercial lease.

On December 27, 1977, appellee and cross-appellant H. Kent Lanterman (tenant) entered into a five-year written lease with E. N. Maisel & Associates. The terms of the agreement provided for a $3,000 letter of credit as security, issued by Central Bank and Trust, and the premises were to be used for the sole purpose of conducting the business of a liquor store. The lease provided that the premises could be used for no other purposes without prior written consent of the landlord. Under the lease tenant was not allowed to sublet the premises or assign the lease without prior written consent of the landlord. On December 27, 1977, the interest of E. N. Maisel & Associates was assigned to appellant and cross-appellee Wichita Properties (landlord).

Tenant took possession of the property on April 24, 1978, with rentals to commence on May 24, 1978. Rent due under the lease was $1,050 per month for the first year, and $1,108.33 per month for the second year, with an additional increase for each additional year. Tenant paid one month's rent of $1,050.00. No other rent was paid. In May or June, 1978, tenant notified landlord that he had been unsuccessful in obtaining a liquor license but was attempting to find someone with a license to operate the store for him. On September 28, 1978, Central Bank and Trust revoked its letter of credit. In early October, 1978, landlord contacted tenant and tenant stated that he was unable to find anyone to run the store and that he did not intend to go through with the contract.

Landlord contacted a local realtor to advertise the premises as being available for lease. The sign already in the parking lot of the shopping center advertised that there was available space, but did not specify the tenant's particular premises as being available. The landlord also sent a representative to Wichita in December once or twice looking for prospective tenants.

In January, 1979, landlord was contacted by ABC Rentals and after considerable negotiation, ABC ultimately entered into a lease to commence July 1, 1979.

Landlord brought this action against tenant for breach of the lease seeking $12,916.95 for total rent due, common area charges of $326.08 and real estate taxes of $990.20. Landlord also tried to

introduce evidence of property damage of $2,710.91. Tenant objected to the introduction of this evidence because property damage was not mentioned in the pleadings. The court gave the landlord the option of continuing the trial for amendment of pleadings, but the landlord's attorney stated that he did not want the leave to amend unless he could introduce the witness' testimony to avoid recalling him at a later date. This was declined and landlord's attorney stated he did not want the leave under such conditions. Central Bank and Trust was also joined as a defendant, and tenant filed a third party petition against Standard Liquor Corporation, which claim was not decided at the time of the appeal. (The claims appealed from were certified by the trial court pursuant to K.S.A. 60-254[b].)

The trial court granted judgment in favor of landlord on the issue of liability. The trial court also found that landlord was reasonably diligent in mitigating damages, only from and after January 1, 1979, during its negotiations with ABC Rentals and was, therefore, only entitled to rent for $6,300.00. The court denied the claim for taxes and charges for common areas. Landlord appeals on the damage issues and tenant cross-appeals from the summary judgment on the issue of liability.

Landlord's first claim of error is that there was no substantial competent evidence to support the trial court's finding that landlord failed to mitigate damages.

Landlord argues on appeal that the tenant had not abandoned the property until he notified landlord in early October that he did not intend to fulfill the contract. Landlord argues, therefore, that it was under no obligation to find a tenant until October, and after that time it listed the property with a realtor and had someone looking for prospective tenants.

The tenant argued that the duty to mitigate arose upon the tenant's notifying the landlord in June that he could not obtain a liquor license, coupled with the continued failure to pay rent.

The trial court held that landlord had not fulfilled his obligation to mitigate damages until January when it began negotiating with ABC Rentals and that all efforts up to that time had been "lackadaisical." The trial court also stated in its journal entry that the landlord's duty to mitigate commenced when it learned the tenant had been denied a liquor license, i.e., in June, 1978.

The rule in Kansas regarding a landlord's duty to mitigate was

recently stated in *Lindsley v. Forum Restaurants, Inc.,* 3 Kan. App. 2d 489, Syl. ¶ 3, 596 P.2d 1250, *rev. denied* 226 Kan. 792 (1979):

"Where a tenant, under contract to pay rent on real property, abandons the property and notifies the landlord of that abandonment, it is the landlord's duty to make a reasonable effort to secure a new tenant and obtain rent before he can recover from the old tenant under the contract so as to lessen the injury. Following *Gordon, Executor v. Consolidated Sun Ray, Inc.,* 195 Kan. 341, Syl. ¶ 3, 404 P.2d 949 (1965)."

Since the duty to mitigate does not begin until tenant abandons the property and notifies the landlord of that abandonment, the issue is whether there is any evidence before the October notification of the tenant's abandonment.

Since the tenant told the landlord that he intended to find someone who could get a liquor license to run the place for him, it would seem that the tenant had no intent to abandon the premises. Tenant was unable to obtain a liquor license because he did not meet the Kansas residency requirements.

While clearly tenant was in breach of the lease upon missing the payments after June, in light of tenant's expressed intent to continue to try to find an alternative method of running the liquor store, this is not evidence of abandonment and notification of said abandonment in June. We conclude, as a matter of law, that there was no abandonment until the landlord was notified of tenant's intent to terminate the lease in early October, 1978. While we recognize the rule that this court is not to reweigh evidence or retry the facts, where said facts are undisputed and are clearly insufficient, this court may rule as a matter of law that there was no abandonment.

As to the months of October, November, and December, 1978, the evidence indicated some, but not much, effort to mitigate on the part of the landlord. The trial court concluded that from and after January 1, 1979, landlord used reasonable and proper attempts to mitigate its damages. The trial court found there was not a reasonable effort to obtain a new tenant prior to January 1, 1979.

"It is not the function of the appellate court to weigh conflicting evidence, pass on the credibility of witnesses or redetermine questions of fact and our only concern is with evidence which supports the trial court's findings, and not with evidence which might have supported contrary findings." *Addis v. Bernardin, Inc.,* 226 Kan. 241, Syl. ¶ 2, 597 P.2d 250 (1979).

We cannot rule as a matter of law that the facts disclosed by the evidence constituted reasonable mitigation. There was no conflicting evidence; however, the trial court might have disbelieved the evidence presented, and certainly found such efforts to be insufficient.

Landlord next contends that the court erred in ruling that tenant did not owe prorated taxes and common area charges because he never occupied the premises.

The trial court found that the landlord was not entitled to recover under its claim for common area charges and real estate taxes because the tenant did not occupy the premises within the meaning of the lease agreement.

Section 6(b) of the lease provides:

"Common Area Charge. Tenant shall pay to Landlord as a 'Common Area Charge' a proportionate share of all cost and expenses of every kind and nature paid or incurred by Landlord in operating and maintaining the Common Areas. Such cost and expenses shall include but not be limited to maintaining, repairing and replacing, cleaning, lighting, snow and ice removal, line painting and landscaping of all vehicle parking areas and other outdoor Common Areas; providing security; providing public liability, property damage, fire and extended coverage and such other insurance as Landlord deems appropriate; total compensation and benefits (including premiums for workmens compensation and other insurance) paid to or on behalf of employees; personal property taxes; supplies; fire protection and fire hydrant charges; water and sewer charges; utility charges; licenses and permit fees; reasonable depreciation of equipment used in operating and maintaining the Common Areas and rent paid for leasing any such equipment; together with all costs of administration of the Shopping Center. Tenant's Common Area Charge shall be determined by multiplying the total cost incurred by Landlord by the ratio of the square feet of floor area within the Premises to the total square feet of floor area leased and occupied within all the buildings in the Shopping Center. For the purpose of Paragraphs 4(a), 11(b) and 22 as well as this Paragraph 6(b) the term 'floor area' with respect to the Premises and with respect to all other leasable area shall refer to floor area on all levels, including mezzanines, basements or balconies. No deduction shall be made for columns, stairs, elevators or any interior construction or equipment. Any change in floor area in such buildings shall be deemed in effect on the first day of the next succeeding month following such change.

"Tenant's Common Area Charge shall be paid in monthly installments on the first day of each month in an amount to be estimated by Landlord. Within ninety (90) days following the end of the period used by Landlord in estimating Landlord's cost, Landlord shall furnish to Tenant a statement of the actual amount of Tenant's proportionate share of such Common Area Charge for such period. Within fifteen (15) days thereafter, Tenant shall pay to Landlord or Landlord shall remit to Tenant, as the case may be, the difference between the estimated amounts paid by Tenant and the actual amount of Tenant's Common Area Charge for such period as shown by such statement."

Section 4(a) of the lease provides:

"Real Estate Taxes and Assessments. Tenant agrees to pay Tenant's proportionate share of all real estate taxes and assessments, both general and special, levied and assessed by any lawful authority, for each calendar year during the term hereof against the land, buildings and all other improvements within the Shopping Center or against any land or improvements which may be added thereto. Tenant's proportionate share shall be the total amount of such taxes and assessments multiplied by a fraction, the numerator of which shall be the number of square feet of floor area within the Premises, and the denominator of which shall be the number of square feet of leased and occupied floor area within all buildings within the Shopping Center at the time such taxes were levied or assessed, but excluding the floor area of any buildings within the Shopping Center which are separately assessed for tax purposes. Copies of tax bills submitted by Landlord to Tenant shall be conclusive evidence of the amount of such real estate taxes and assessments levied or assessed, as well as the item taxed.

"During the term of this lease, Tenant shall pay to Landlord, monthly in advance, an amount equal to 1/12th of Tenant's proportionate share of real estate taxes and assessments for the current tax year, as reasonably estimated by Landlord. If Tenant's proportionate share of taxes with respect to any tax year is less than the total amount theretofore paid by Tenant for such period, the excess shall be credited against the payments with respect to real estate taxes next becoming due. If Tenant's proportionate share of taxes for any tax year exceeds the total amount theretofore paid by Tenant for such period, Tenant shall, upon receipt of invoices from Landlord, pay the difference between the actual amount paid by Tenant and Tenant's proportionate share of real estate taxes and assessments."

In *State Bank of Parsons v. First National Bank in Wichita,* 210 Kan. 647, Syl. ¶ 1, 504 P.2d 156 (1972), it was held:

"Regardless of the construction of a written instrument made by the trial court, on appeal the instrument may be construed and its legal effect determined by the supreme court."

There is no provision in the lease before us which makes tenant's liability for taxes and common area charges conditional upon occupancy of the premises. The trial court erred in so construing the lease. Neither does the law make these types of charges conditional upon occupancy.

Landlord further claims that the court abused its discretion in excluding evidence of physical damage to the premises because of failure to include the theory in the pleadings.

K.S.A. 60-215(b) provides in pertinent part:

"If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved

thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence."

The tenant objected to the introduction of the evidence of damage to the property. The trial court was within its discretion to order a continuance for the amendment of pleadings. Landlord cannot now complain after refusing to amend the pleadings.

The issue on the cross-appeal is whether the court erred in granting summary judgment on the issue of liability.

Tenant cross-appeals from the trial court's granting of summary judgment on the issue of liability. The trial court held that tenant's defense of inability to obtain a retail liquor license to operate the premises as a retail liquor store was not tenable because the occurrence was foreseeable at the time the lease was executed and the defense was a subjective impossibility rather than an objective impossibility.

Landlord claims that whether the denial of the liquor license was reasonably foreseeable is a question of fact, and further that the denial of a liquor license is analogous to a situation where a change in law renders performance impossible, making nonperformance excusable, citing 17 Am. Jur. 2d, Contracts § 419.

The Kansas courts have followed the rule that subjective impossibility is not a defense. In *White Lakes Shopping Center, Inc. v. Jefferson Standard Life Ins. Co.*, 208 Kan. 121, 124, 490 P.2d 609 (1971), it is stated:

"The impossibility which will, or may, excuse the performance of a contract *must exist in the nature of the thing to be done. It must not exist merely because of* the inability or incapacity of the promisor or obligor to do it. (17A C.J.S., Contracts, § 463(1), p. 610; 17 Am. Jur. 2d, Contracts, § 506, p. 987; *State Highway Construction Contract Cases*, 161 Kan. 7, 166 P.2d 728; *Winfrey v. Automobile Co.*, 113 Kan. 343, Syl. 4, 214 Pac. 781.)

"In *Winfrey v. Automobile Co.*, supra, it was said:

" 'Where one agrees to perform an act possible in itself he will be liable for a breach thereof although contingencies not foreseen by him arise which make it difficult or even beyond his power to perform and which might have been provided against in the agreement.' (Syl. ¶ 4.)"

The Kansas Supreme Court distinguished between subjective and objective impossibility of performance in *State Highway Construction Contract Cases*, 161 Kan. 7, 67, 166 P.2d 728 (1946):

"Respecting impossibility of performance of a contract after it has been exe-

cuted, the authorities note that there is a difference between 'the thing cannot be done' and 'I cannot do it.' (Restatement of Contracts, § 455, comment 1.) The first of these is referred to as objective and the second as subjective. The same distinction is made in Williston on Contracts (Rev. ed.), pp. 5411-12. Both authorities agree that the second statement, 'I cannot do it,' never relieves the promisor, the reason being that the promisor had agreed and definitely bound himself to perform, and cannot be heard to say otherwise."

While Kansas has not dealt with a factual situation in which a permit of license is denied by a governmental authority, several other jurisdictions have ruled on whether such a situation constitutes impossibility.

In *Ogdensburg Urban Renewal Agency v. Moroney,* 42 App. Div. 2d 639, 640, 345 N.Y.S.2d 169 (1973), the appellant claimed impossibility because federal funding had not been approved. The court held that appellant knew at the time that it entered the contract for purchase of the property that it would need federal approval if federal money was to be available and yet the contract was silent concerning approval. The court stated:

"[T]he defense of impossibility is only available where the performance is rendered impossible by the happening of an unanticipated event which could not be foreseen or guarded against in the contract."

In *North American Capital Corporation v. McCants,* 510 S.W.2d 901 (Tenn. 1974), the court recognized the defense of frustration of commercial purpose. That doctrine provides that where there is a total or near total destruction of the purpose for which, in the contemplation of both parties, the lease was entered into, performance of the lease is excused. However, in this particular case, the doctrine was held inapplicable where the government failed to approve a site for a savings and loan. The court held that the failure to approve the site was reasonably foreseeable and that the defense of frustration of commercial purpose was not applicable.

In *Helms v. Investment Co.,* 19 N. C. App. 5, 198 S.E.2d 79 (1973), the court granted summary judgment for plaintiff on the issue of liability for breach of contract to provide water and sewer facilities. The sole issue was whether prohibition by the city and county of sewer and water facilities would excuse the promisors of their obligation. It was held the parties in the exercise of reasonable care should have anticipated that they might encounter some difficulty from the city and county in view of current emphasis on pollution problems in metropolitan areas.

Citing from 17A C.J.S., Contracts § 463(1), p. 611, the court stated:

" 'Where a party enters into a contract knowing that permission of government officers will be required during the course of performance, the fact that such permission is not forthcoming when required does not constitute an excuse for nonperformance.' " 19 N. C. App. at 8.

Under the facts of this case, the tenant knew that he would have to obtain a liquor license in order to run the liquor store. He should have provided in the contract for such contingency. Under these circumstances the defense of impossibility or frustration of commercial purposes has generally been held to be inapplicable. If tenant wished to raise some facts making the inability to obtain a liquor license unforeseeable, he should have done so by affidavit in a response to the motion for summary judgment. Our record shows that no response was filed.

" '[T]here is an affirmative duty upon the non-moving party to respond with counter affidavits or take advantage of the alternatives offered to him, which are to ask leave to make additional discovery or to show good cause why he cannot obtain and present by affidavits facts essential to justify his position.' " *Miller v. Sirloin Stockade,* 224 Kan. 32, 36, 578 P.2d 247 (1978), citing from Gard's Kansas C. Civ. Proc. § 60-256 (1977 Supp.), p. 98.

Also, it is noted in *Dugan v. First Nat'l Bank in Wichita,* 227 Kan. 201, Syl. ¶ ¶ 1, 2, 606 P.2d 1009 (1980):

"Summary judgment is proper only if there are no genuine issues of material fact.

"A trial court, in ruling on motions for summary judgment, should search the record to determine whether issues of material fact do exist."

Further, in *Collier v. Operating Engineers Local Union No. 101,* 228 Kan. 52, Syl. ¶ 2, 612 P.2d 150 (1980), it is stated:

"An appellate court in examining the validity of a motion for summary judgment should read the record in the light most favorable to the party who defended against the motion. It should accept such party's allegations as true, and it should give him the benefit of the doubt when his assertions conflict with those of the movant."

The trial court committed no error in granting summary judgment against the tenant on the issue of liability.

In conclusion, the trial court erred in holding that the duty to mitigate commenced in June because of the absence of any evidence in the record to show an abandonment. Once the tenant advised the landlord that he was forsaking the lease—in early

October, 1978—clearly the landlord then had a duty to mitigate. Since there was some evidence before the trial court relative to the months of October, November and December, 1978, upon which it could base a finding of failure to mitigate, we conclude that its ruling as to those three months must stand. The lost rent, shown as being due to landlord on his exhibit No. 16 of $12,916.95, must be reduced by the sum of $3,150.00 (same being for the $1,050 per month rent for October, November, and December, 1978), leaving the amount of rent which should have been awarded to landlord the sum of $9,766.95.

As we have noted, the trial court denied the landlord payment for common area charges on the ground that the tenant did not occupy the premises. This, too, we concluded was error. Since we have determined that the trial court must be affirmed as to tenant's nonliability for rent for the months of October, November, and December, 1978, it follows that tenant is not liable for the common area charges for those three months. Therefore the common area charges of $326.08 shown to be claimed by landlord in its exhibit 16, must be reduced by the sum of $98.81, the same being the fourth quarterly charges (October, November, and December, 1978), during which quarter the tenant was not liable for such charges because of the ruling hereinabove that landlord had failed to properly mitigate during those three months of 1978. Therefore, landlord should receive in judgment for common area charges the sum of $227.27.

What we have said as to common area charges is likewise true as to the liability of tenant for taxes. We note, again by reference to the evidence in the case, that the $513.83 claimed by landlord for 1978 taxes was based on 221 lease days during 1978, or $2.325 per day. Tenant should be credited with 92 days (again those being the days during October, November and December, 1978), or $213.90. Landlord should thus receive judgment from tenant for taxes in the amount of $299.93.

From the above, we conclude that landlord should be awarded damages in the sum of $9,766.95 for rent, $227.27 for common area charges, and $299.93 for taxes owed by tenant, for a total judgment in the sum of $10,294.15 in favor of landlord. This case is remanded to the trial court for judgment in accordance with the views expressed herein.

Affirmed in part; reversed in part and remanded with instructions.

REES, J., dissenting.

Lanterman appeals from the summary judgment ruling which held that because of his failure to pay rent he is liable for breach of his December 27, 1977, contract with plaintiff's assignor. The essence of his argument to the trial court and to us is that impossibility of performance excuses his nonpayment of rent. It is said that performance of the contract was rendered impossible because the contract required his use and occupancy of the premises to be exclusively for the purpose of operating a liquor store and he was denied a retail liquor license by a decision of the state Alcohol and Beverage Control Board made after the contract was signed.

From *White Lakes Shopping Center, Inc., v. Jefferson Standard Life Ins. Co.,* 208 Kan. 121, 124, 490 P.2d 609 (1971); *State Highway Construction Contract Cases,* 161 Kan. 7, 66-68, 166 P.2d 728 (1946); *Berline v. Waldschmidt,* 159 Kan. 585, 588-591, 156 P.2d 865 (1945), we glean the relevant impossibility of performance rules. Where performance of an act provided by a contracting party is or becomes impossible for any person at any time, that is, the act is or becomes impossible in itself, it is said there is objective impossibility of performance. Where there is objective impossibility of performance, performance by the promisor is excused unless the impossibility was foreseeable and might have been provided against in the contract. Where performance of an act promised by a contracting party is or becomes impossible for the promisor, but not for some other person or at some other time, that is, the act is not, or does not become, impossible in itself, it is said there was subjective impossibility of performance. Where there is subjective impossibility of performance, performance by the promisor is not excused unless provided against in the contract.

Lanterman's challenge of the summary judgment order cannot stand. The act of use and occupancy of the premises for the exclusive purpose of operating a liquor store was not and did not become an act impossible in itself; someone could have done it; the question of foreseeability is of no moment. Lanterman's personal inability to operate a liquor store was, at best, a matter of subjective impossibility of performance not guarded against in the contract. The summary judgment order was not erroneously entered.

As I understand the facts, the contract requirements for payment of rent were that on May 24, 1978, and on the 24th day of each of the following eleven months $1,050 was to be paid as and for rent for the preceding month; and that on May 24, 1979, and on the 24th day of each of the following eleven months $1,108.33 was to be paid as and for rent for the preceding month. Rent attributable to the period June 24, 1979, through June 30, 1979, was $258.62. Thus, for the period from April 24, 1978, when Lanterman took possession, to July 1, 1979, when ABC Rentals' lease commenced, the total rent obligation was $15,075.28. On June 22, 1978, when his first monthly rental payment was some 29 days delinquent, Lanterman made his first and only payment, $1,050. Consequently, his liability exposure to plaintiff for unpaid rent was $14,025.28.

The trial judge found that as of about June 1, 1978, there arose on the part of the plaintiff the duty to make a reasonable effort to mitigate its damages and that the plaintiff failed to fulfill this duty until January, 1979. Without attempting to account for specific dates, a task the majority and I find impossible under the evidence, it appears the damages judgment of $6,300 was intended to represent the rent not paid in the months of January through June, 1979. If so, and if the trial judge chose to not compensate plaintiff for the seven day "tail" at the end of June, 1979, the award should have included an additional $116.66, for a total award of $6,416.66. However, plaintiff makes no complaint in this regard. Instead it argues it was entitled to recover for all 1978 rent payments called for by the contract and not paid. The argument made is that no duty to mitigate arose until about October 1 and that from and after that time it fulfilled that duty.

The majority agrees with plaintiff and holds that as a matter of law it was about October 1 that the duty to mitigate arose. The majority finds evidence supporting the trial finding of fact that it was not until about January 1 that plaintiff made reasonable efforts to mitigate. They then hold plaintiff should recover the dollar amount it claims for unpaid rent after excluding the $3,150 that was to be paid in October, November and December. Since the amount sought by plaintiff for unpaid rent was $12,916.95, not $14,025.28, the majority concludes plaintiff is entitled to $9,766.95.

I agree with the majority that the finding of the trial judge that it was not until January that there were reasonable efforts by the plaintiff to mitigate is a finding of fact supported by sufficient evidence. Where I part company with the majority is at their conclusion that as a matter of law it was only for the rent payments due after October 1 that plaintiff's entitlement to damages required reasonable effort to mitigate the loss. Whether there was a reasonable effort to mitigate is a question of fact. I am of the view that similarly whether at a given time reasonable effort to mitigate is required of a person so as to entitle him to damages is a question of fact. The resolution of a question of fact by the fact finder must be sustained on appeal if there is supporting evidence. It is patent that the fact finder, the trial judge, was aware of the applicable mitigation of damages law and that he applied it as he found proper under the circumstances.

I cannot accept the majority's apparent position that the trial court finding of the period of time when plaintiff made reasonable efforts to mitigate its damages is a finding of fact to be approved on appeal if there is supporting evidence but that the trial judge's finding of when plaintiff needed to make reasonable efforts to mitigate its damages should be reversed as a matter of law. In the journal entry of judgment is the finding that the "[plaintiff's] duty to mitigate commenced when [it] learned a liquor license had been denied." This was about June 1, 1978. At that time, some five months had passed since the contract was made, Lanterman informed plaintiff he had been denied a retail liquor license but that he would try to find someone to operate the liquor store for him, and he was in arrears on his rent. As I see it, the majority holds that the evidence establishing these facts was insufficient to support the trial judge's finding and that as a matter of law in this case abandonment by the tenant, Lanterman, was necessary to require reasonable effort by plaintiff to mitigate. I detect in the majority opinion excess concern with, or emphasis on, the matter of abandonment and I am concerned with the treatment of the doctrine of avoidable consequences as a matter of duty.

At 22 Am. Jur. 2d, Damages § 33, pp. 55-57, it is said:

"The general doctrine of avoidable consequences applies to the measure of damages in actions for breach of contract. Thus, the damages awarded to the nondefaulting party to a contract will be determined and measured as though that party had made reasonable efforts to avoid the losses resulting from the default.

*Some courts have stated this doctrine in terms of a duty owing by the innocent party to the one in default;* that is, that the person who is seeking damages for breach of contract has a duty to minimize those damages. *However, on analysis, it is clear that in contract cases as well as generally, there is no duty to minimize damages,* because no one has a right of action against the nondefaulting party if he does not reasonably avoid certain consequences arising from the default. Such a failure does not make the nondefaulting party liable to suit; it only indicates that the damages actually suffered are greater than the law will compensate. *Therefore, in contract actions, the doctrine of avoidable consequences is only a statement about how damages will be measured.*

"The innocent party is not required to take extraordinary efforts to avoid the losses from the breach of contract nor is he expected to incur risks or spend substantial sums of money to protect the defaulter. Nor need he sacrifice a substantial right of his own in order to minimize his loss. All that is required of the nondefaulting party—*in measuring his damages*—is that he act reasonably so as not unduly to enhance the damages caused by the breach. If the court determines that he has not acted reasonably to avoid damages, the actual award of damages for the breach will be reduced by the amount which could have been reasonably avoided. On the other hand, if the court decides that the nondefaulting party has made reasonable efforts to minimize defendant's damages, the award will not be limited by the doctrine of avoidable consequences. *Since the primary question is one of the reasonableness of the action of the nondefaulting party, each case must necessarily turn on its own facts.*" (Emphasis added.)

In *Creten v. Chicago, Rock Island & Pac. Rld. Co.,* 184 Kan. 387, 402, 337 P.2d 1003 (1959), the statement in the opinion that the plaintiff there was under a duty to exercise reasonable care and diligence under the circumstances to mitigate his damages is preceded by:

"It is a general rule of law that one who is injured by the wrongful or negligent acts of another is bound to exercise reasonable care and diligence under the circumstances to avoid loss or to minimize the resulting damages and *to the extent* that his damages are the result of the failure to exercise such care and diligence, he cannot recover [citations omitted]." (Emphasis added.)

The doctrine of avoidable consequences and its treatment in opinions is cogently addressed in *Theis v. duPont, Glore Forgan Inc.,* 212 Kan. 301, 307-308, 510 P.2d 1212 (1973), where it is said:

"Our cases have frequently stated that one who is damaged by breach of contract is under a *duty* to minimize or mitigate his damages where he can do so by the exercise of reasonable diligence. See, *e.g., Swisher v. Beckett,* 172 Kan. 711, 242 P.2d 831; *Cain v. Grosshans & Petersen, Inc.,* 196 Kan. 497, 413 P.2d 98; *In re Estate of Stannard,* 179 Kan. 394, 295 P.2d 610. The use of the term 'duty' is criticized by the text writers. See 5 Corbin on Contracts, § 1039; 11 Williston on Contracts, § 1353. The rule, more properly stated, is simply that damages are not recoverable for harm that the plaintiff should have foreseen and could have

avoided by reasonable effort without undue risk, expense or humiliation. Restatement, Contracts, § 336. Comment *d* to the Restatement section explains why the term 'duty' should not be employed:

" 'It is not infrequently said that it is the "duty" of the injured party to mitigate damages so far as that can be done by reasonable effort on his part. Since his legal position is in no way affected by his failure to make this effort, however, it is not desirable to say that he is under a "duty." His remedy will be exactly the same, whether he makes the effort and avoids harm or not. But if he fails to make the reasonable effort with the result that his harm is greater than it would otherwise have been, he cannot get judgment for the amount of this avoidable and unnecessary increase. The law does not penalize this inaction; it merely does nothing to compensate him for the harm that a reasonable man in his place would have avoided.' (p. 537)

"The use of the term duty has also been criticized occasionally in our own cases without lasting impact. See *Rock v. Vandine,* 106 Kan. 588, 189 Pac. 157; *Griffin v. Oklahoma Natural Gas Corp.,* 132 Kan. 843, 847, 297 Pac. 662, 81 A.L.R. 274. A party rests under a disability to claim damages which he might have prevented."

## In *Osborn v. Grego,* 226 Kan. 212, 217, 596 P.2d 1233 (1979), the doctrine is stated again:

"Damages are not recoverable for harm that a party should have foreseen and could have avoided by reasonable effort without undue risk, expense or humiliation. *Theis v. duPont, Glore Forgan Inc.,* 212 Kan. 301, Syl. ¶ 8."

## Despite the foregoing, we find in Kansas decisions:

"It is a long-standing rule in this state that where a tenant, under contract to pay rent on real property, abandons the property and notifies the landlord of that abandonment, it is the *duty* of the landlord to make a reasonable effort to secure a new tenant for the property and obtain rent therefrom before he can recover rent from the old tenant under the contract. Where a party seeks redress for the wrong of another, the law requires that he shall do whatever he reasonably can and improve all reasonable opportunities to avoid the consequences and to lessen the injury." (Emphasis added.) *Gordon, Executor v. Consolidated Sun Ray, Inc.,* 195 Kan. 341, 344-345, 404 P.2d 949 (1956).

"The *duty* to mitigate damages is not an unlimited one; an injured party is bound only to exert reasonable efforts to avoid damage; his *duty* is limited by the rules of common sense." (Emphasis added.) *Steele v. J. I. Case Co.,* 197 Kan. 554, 565, 419 P.2d 902 (1966).

"It is a general rule of law that one injured by reason of a breach of contract by another is under a *duty* to exercise reasonable care to avoid loss or to mitigate and minimize the resulting damage. Such reasonable care does not require a party to execute a new or different contract." (Emphasis added.) *Iseman v. Kansas Gas & Electric Co.,* 222 Kan. 644, Syl. ¶ 1, 567 P.2d 856 (1977).

"An injured party has a *duty* to mitigate damages. However, that *duty* does not require the party to take unreasonable risks, incur unreasonable inconvenience or expense, or disorganize his business." (Emphasis added.) *Barbara Oil Co. v. Patrick Petroleum Co.,* 1 Kan. App. 2d 437, Syl. ¶ 5, 566 P.2d 389, *rev. denied* 222 Kan. 749 (1977).

To repeat, the doctrine of avoidable consequences, or the mitigation of damages rule, neither gives rise to nor bars a cause of action. As stated in *Theis,* the rule simply is that damages are not recoverable for harm the plaintiff should have foreseen and could have avoided by reasonable effort without undue risk, expense or humiliation. Whether harm was foreseeable and avoidable has to be a fact question.

It may be correct to say that where a tenant, under contract to pay rent on real property, abandons the property and notifies the landlord of that abandonment, damages for unpaid rent accruing thereafter are not recoverable in the absence of reasonable efforts on the part of the landlord to lessen his injury. It is a different thing to say the landlord need attempt to lessen his injury only when there is abandonment. I am not prepared to say that when the fact finder is aware of the doctrine and the evidence supports his or their decision, an appellate court, relying on the fact the evidence was undisputed, may decide as a matter of law when harm was foreseeable and avoidable, or as in this case, to decide as a matter of law that harm was not foreseeable and avoidable until a certain time. It is my conclusion that the trial judge, having seen the witnesses and having heard the testimony, having obviously taken the doctrine or rule into consideration, and having before him evidence that in June, 1978, Lanterman was in arrears on his rent payments and had neither obtained a retail liquor license nor arranged for some licensee to run the business in the five months since the contract was made, cannot be found as a matter of law to have erred in denying recovery for 1978 rent due but unpaid. I would sustain the trial court judgment for unpaid rent.

I would affirm the trial court denial of recovery for taxes, common area charges and damage to the premises, but not for the reason given by the trial judge.